In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-10-00002-CR

                                                ______________________________

 

 

                                    WILLIAM LEE SMARR,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                       On Appeal from the 115th
Judicial District Court

                                                            Upshur County, Texas

                                                            Trial
Court No. 15,237

 

                                                        
                                          

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                        Memorandum Opinion by Chief Justice Morriss








                                                      MEMORANDUM OPINION

 

            No doubt,
William Lee Smarr had ingested a mix of legal prescription medications[1]
before he attempted to drive his three children home after a day-long fishing
trip, ultimately resulting in a jury deciding that Smarr was guilty of DWI,
with child passengers, and assessing a sentence of fifteen months’
confinement.  The trial court sentenced
Smarr consistent with the jury’s assessment. 
The questions before us on Smarr’s appeal concern the sufficiency of the
evidence to prove that Smarr drove without his normal mental or physical
faculties because he had ingested medications. 
Because we determine that the evidence was legally and factually
sufficient, we affirm the judgment of the trial court.

            As the Smarr
vehicle approached Smarr’s house, its erratic movements suggested Smarr’s
distress.  First, the vehicle stopped in
the middle of the road with its motor running. 
Then, with Smarr apparently unconscious or semiconscious, the vehicle
began moving forward.  When Smarr did not
respond to his children’s calls, and the vehicle passed Smarr’s driveway, one
quick-thinking son got down on the floorboard and held Smarr’s foot on the
brake pedal while the other quick-thinking son steered the vehicle off the
road.  

            By the time
the police arrived, Candace Smarr, the children’s mother and Smarr’s ex-wife,
had taken the children to their residence located “right back up the road” and
had returned to the scene.  Ms. Smarr
told the police that Smarr had taken too much medication.  Smarr was transported to a local hospital in
an ambulance and was diagnosed as suffering from an overdose of prescription medication.  Approximately nine days later, Smarr was
diagnosed as suffering from mild hypoglycemia (low blood sugar).

            On appeal,
Smarr argues the evidence is legally and factually insufficient to support the
jury’s verdict.  The State was required
to prove that Smarr did not have “normal use of mental or physical faculties by
reason of the introduction of . . . a drug . . . into the body.”  See
Tex. Penal Code Ann. §§ 49.01,
49.04 (Vernon 2003), § 49.045 (Vernon Supp. 2009).  Smarr’s argument is limited to whether he was
intoxicated by reason of the introduction of a drug.  Smarr points out that the police and medical
personnel at the hospital never bothered to look for any cause of Smarr’s impairment
other than the one suggested by Smarr’s recently divorced wife—an overdose of
medication.  According to Smarr, his
conviction is the result of this myopia. 
Smarr posits that the evidence establishes reasonable doubt that his
condition was caused by the introduction of a drug into his body, rather than
the result of hypoglycemia compounded by dehydration.

            In conducting a legal sufficiency
review, we consider the evidence in the light most favorable to the verdict to
determine whether any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt.  Laster v. State, 275 S.W.3d 512, 517
(Tex. Crim. App. 2009).  We must give
deference to “the responsibility of the trier of fact to fairly resolve
conflicts in testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts.” 
Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Jackson
v. Virginia, 443 U.S. 307, 318–19 (1979)).  

            In conducting a
factual sufficiency review, we consider the evidence in a neutral light.  Watson v. State, 204 S.W.3d 404,
414–15 (Tex. Crim. App. 2006).  We may
find evidence factually insufficient in two ways:  (1) the evidence supporting the conviction is
“too weak” to support the fact-finder’s verdict, or (2) considering conflicting
evidence, the fact-finder’s verdict is against the great weight and
preponderance of the evidence.  Laster,
275 S.W.3d at 518.  Both legal and
factual sufficiency are measured by the elements of the offense as defined by a
hypothetically correct jury charge.  Malik
v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); see also Grotti v.
State, 273 S.W.3d 273, 280 (Tex. Crim. App. 2008).

            David Cruze,
a deputy with the Upshur County Sheriff’s Office, testified that, at the scene,
Smarr had “difficulty maintaining his balance”:

As I asked him to walk back to my car,
he was stumbling, he had to grab onto the side of the truck to keep his - - to
keep his balance, and as we got to the back of the truck, past the back of his
vehicle, I was walking to his right, he just fell to the left and started
stumbling real hard to the [l]eft and I had to actually grab him by his arm to
keep him from falling down, which he would have.

 

Smarr informed Cruze he had not had anything to drink, but
had taken his medication.  Cruze did not
smell any odor of alcohol on Smarr and did not find any alcohol in the
vehicle.  

            Wes Whalen,
a paramedic for the East Texas Medical Center, testified that, at the scene,
Smarr’s speech was slurred and he appeared to be intoxicated.  Whalen testified that Smarr told him he had
ingested a morphine tablet and that Smarr’s vehicle contained prescription
bottles of Alprazolam (Xanax), Soma, and Norco. 
Smarr had been prescribed a sustained-release form of morphine referred
to in the record as MS-Contin.  Whalen
testified he performed a test for blood sugar, referred to as a D-stick, at the
scene, but did not know the results. 
Whalen testified that a saline solution was administered to Smarr
intravenously.  

            At the
hospital, Smarr was examined by Dr. Brian Kempton, an emergency physician.  When Kempton first examined Smarr, Smarr had
slurred speech, responded slowly to questions, and appeared lethargic.  Kempton testified that Smarr seemed not to
understand he was lethargic and concluded Smarr’s “insight into what was going
on seemed impaired.”  The hospital took a
sample of Smarr’s blood approximately thirty-three minutes after Kempton’s
first visit.  Kempton testified that
Smarr’s blood did not contain detectable levels of alcohol.  Smarr’s blood tested positive for opiates and
benzodiazepine, but the quantity of those substances was not determined.  Smarr denied taking an overdose of his
medication.  Two of Smarr’s prescribed
drugs, MS-Contin, which is a sustained-release form of morphine, and Norco,
which is a form of hydrocodone, would “show up positive as opiates” in a blood
test.  The Xanax prescribed to Smarr is a
benzodiazepine.  When asked if a person could
be intoxicated on a mixture of “Soma, Norco, Xanax, morphine, even if they were
within therapeutic levels,”  Dr. Kempton
responded,  “I’d say there’s a
significant interaction among those that would -- I think anybody who took that
would be intoxicated.”  When asked if
anything in his report would lead him to believe Smarr was in hypoglycemic
shock, Kempton responded, “Nothing here . . . Normal people don’t get
hypoglycemic.  I mean, that just is
vanishingly rare.”  Kempton testified his
notes do not indicate a result for the D-stick test for Smarr’s blood-sugar
level, but also testified EMS personnel normally check a patient’s blood-sugar
level.  Kempton diagnosed Smarr as
suffering from a drug overdose and testified it was “pretty obvious that [Smarr]
was heavily intoxicated on multiple substances.”  Kempton testified that he treated Smarr for
only forty minutes and that his interaction with Smarr was pretty limited.  

            Just minutes
after the blood sample was drawn, there was a shift change at the hospital.  Dr. David Buller, a physician who has a
family practice and also works as an ER physician at the hospital, came on
duty.  By a coincidence, Buller was
Smarr’s family physician.  At the
hospital, Buller diagnosed Smarr as suffering from a drug overdose.  Buller did not order any additional testing
at the hospital, and Smarr was discharged from the hospital approximately
forty-four minutes after Buller came on duty. 
Buller, though, was surprised at Smarr’s quick recovery and testified he
“would not expect a drug overdose to cure that rapidly.”[2]  Buller testified Smarr had been a patient of
his for more than five years and was taking the medications before becoming his
patient.  Buller testified that, if the
medications had been taken as prescribed, Smarr would have been safe to drive a
motor vehicle.  Approximately nine days
after Smarr’s hospital visit, Buller conducted a glucose tolerance test on
Smarr and diagnosed Smarr with mild hypoglycemia.[3]  The results of the glucose tolerance test
caused Buller to revise his diagnosis and to conclude that Smarr’s condition
was the result of multiple factors including hypoglycemia, dehydration,[4]
and the medications.  Buller testified,
“[T]here are -- I believe are multiple factors involved, hypoglycemia could be
a possibility, drinking Monster drinks which he admitted to could be a
contributing factor in addition to taking his regular dose of medication.”  Buller admitted that Smarr’s blood test at
the hospital indicated a glucose level of 97, a normal level.  Buller testified that Smarr’s body could have
corrected the blood-sugar level in the hour between the arrest and the blood
test through “a process of glucogensis” where “the body would recognize the
sugar is low” and “would take protein and fat and convert it back into sugar,
raise the blood sugar back up to a level that the body likes.”[5]  The State cross-examined Buller:

Q.        .
. . in an hour and 41 minutes you’re telling me it’s normal for you to raise
your glucose level that high?

 

A.        That’s
not what I said.

 

Q.        It’s
not normal, is it?

 

A.        That’s
not what I said.

 

Q.        Okay.  Is that normal?

 

A.        Unlikely.

 

Q.        Unlikely.

 

A.        Uh-huh, to go that big a distance.  That’s why my opinion is more than one thing
involved.

 

When asked, “Can you say with any medical probability that he
was in the condition he was due to a drug overdose on that day,” Buller
responded, “I cannot.”  

            The State
limits its appellate argument to whether the evidence is sufficient to show
that Smarr took an overdose of his prescription medication.  The State, though, was not required to prove
Smarr took an overdose.  The fact that a
defendant was entitled to use prescribed medication is not a defense to DWI.  See Tex. Penal Code Ann. § 49.10 (Vernon Supp.
2009).  “[A] person may drive after
taking a prescription medication so long as that person has not lost the normal
use of his mental or physical faculties by reason of introduction of the
prescription drug into his body.”  Paschall v. State, 285 S.W.3d 166, 178
(Tex. App.—Fort Worth 2009, pet. ref’d). 
Thus, our review is not concerned with whether the evidence supports a
conclusion that Smarr took more medication than prescribed.  The question, rather, is whether the evidence
supports a conclusion that Smarr’s impaired condition resulted from ingesting
prescription drugs, regardless of the amount.[6]

            A rational
person could have concluded that, beyond a reasonable doubt, Smarr was
guilty.  The jury could have chosen to
believe Kempton’s diagnosis over the diagnosis of Buller.  Kempton testified the prescription drugs
could have caused Smarr to be intoxicated even if taken at therapeutic levels
and, in his opinion, Smarr’s condition was the result of Smarr’s prescription
drugs.  The jury could have rejected
Buller’s testimony.  The evidence is
legally sufficient.

            The
next question is whether the evidence is factually sufficient to support the
jury’s verdict.  Buller testified Smarr’s
hypoglycemia and dehydration may have contributed to Smarr’s condition.  We note that “a defendant cannot be found to
be intoxicated if he lacks the normal use of mental or physical faculties for a
different reason, such as disability, illness, fatigue, stress, or clumsiness.”
 Hernandez
v. State, 107 S.W.3d 41, 51 (Tex. App.—San Antonio 2003, pet. ref’d); see Drapkin
v. State, 781 S.W.2d 710, 711 (Tex. App.—Texarkana 1989, pet. ref’d)
(“Fatigue is not an affirmative defense. 
It is an alternative cause.”); Massie
v. State, 744 S.W.2d 314, 316 (Tex. App.—Dallas 1988, pet. ref’d); cf. Atkins v. State, 990 S.W.2d 763, 767
(Tex. App.—Austin 1999, pet. ref’d) (error to give instruction on synergistic
effect of fatigue and alcohol).

            In a factual
sufficiency review, however, we may
find the evidence insufficient only when necessary to prevent manifest
injustice.  Laster, 275 S.W.3d at
518.  Although we give less deference to
the verdict in a factual sufficiency review, we will not override the verdict
simply because we disagree with it.  Id.  Buller testified merely that Smarr’s
hypoglycemia was a factor in causing the condition.  According to Buller, the condition was caused
by multiple factors, including hypoglycemia, dehydration, and the prescribed
medications, acting together.  Thus,
Buller’s testimony does not establish that hypoglycemia and dehydration caused
Smarr’s impairment by themselves, or conversely that the drugs did not cause
it.  Even according to Buller, the
prescribed medication still played a role in Smarr’s condition.  The overwhelming great weight and preponderance
of the evidence does not dictate a finding against Smarr’s drug ingestion
causing his impairment.  Nor is the
evidence of medication-caused impairment so weak that the State failed to
establish Smarr’s guilt beyond a reasonable doubt.  Our skepticism about the jury’s conclusion is
not sufficient to reach the high level required to reverse a jury’s
verdict.  The evidence is factually
sufficient.

            For the
reasons stated, we affirm the trial court’s judgment.

 

 

 

 

                                                                                    Josh
R. Morriss, III

                                                                                    Chief
Justice

 

Date Submitted:          September
7, 2010

Date Decided:             September
10, 2010

 

Do Not Publish











[1]The
medications had been prescribed to treat Smarr’s pain caused by “a herniated
disc in his neck and low back,” as well as a crush injury to his foot.  





[2]Kempton
agreed MS-Contin would “wear off slowly.” 


 





[3]The
State argues that glucose tolerance test performed by Buller “showed Smarr’s
glucose levels to be within the normal range” and, therefore, “does not even
contradict the jury’s verdict.”  The
State’s argument suggests that Buller’s diagnosis is incorrect and, therefore,
does not contradict the jury’s verdict. 
We have no doubt that the diagnosis of hypoglycemia is more complicated
than merely comparing the test results to the ranges preprinted on the test
result form.  Buller admitted the glucose
levels were within the ranges which might be considered normal, but testified
the variances in the blood-sugar levels led him to conclude Smarr was
hypoglycemic.  We are not medical doctors,
and it is not our role to determine whether Buller’s diagnosis was
correct.  The State did not present any
expert testimony that Buller’s analysis of the glucose tolerance test was
incorrect.





[4]Buller
testified that Smarr reported fishing all day without eating, but while
drinking Monster drinks on “a pretty warm day.” 
Buller opined that, therefore, Smarr was probably “a little dehydrated
as well.”  

 





[5]Kempton
testified that a person who was suffering from hypoglycemic shock would recover
only if “we intervened some way,” such as giving him “glucose or even an IV of
glucose.”  Kempton testified that the
chart did not indicate any fluids were administered to Smarr.  However, as noted above, Whalen testified
that a saline solution was administered intravenously.





[6]We
are not suggesting the amount of drugs in Smarr’s body is not relevant to the
inquiry of whether Smarr’s condition was caused by the prescription drugs.  Buller testified a quantitative test could
have been conducted.  A quantitative
analysis would have greatly strengthened the State’s case.  However, the State did not perform any tests
to determine the quantity of the prescribed medication in Smarr’s blood.  While such a quantitative analysis would have
strengthened the State’s case, such an analysis is not required.